

B. McKay Mignault, Chief Bankruptcy Judge
United States Bankruptcy Court

**Dated: April 4th, 2023**

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

| | |
|---|---|
| IN RE:<br><br>WILLIAM WARREN MUCKLOW,<br><br><br>        Debtor. | CASE NO. 2:19-bk-20450<br><br>CHAPTER 7<br><br><br>JUDGE B. MCKAY MIGNAULT |
| JESSICA L. HALSTEAD,<br>GENA L. ELLIOT, and<br>TABITHA N. ADKINS,<br><br><br>        Plaintiffs,<br>v.<br><br>WILLIAM WARREN MUCKLOW,<br><br>        Defendant. | ADVERSARY PROCEEDING NO.<br>2:20-ap-02000 (Lead)<br>2:20-ap-02001<br>2:20-ap-02002 |

### <u>MEMORANDUM OPINION AND ORDER</u>

Pending in the three above-listed adversary proceedings (the "Adversary Proceedings" and each an "AP") are three Complaints: (1) Jessica L. Halstead's Complaint (dckt. 1, AP No. 20-2000 (lead)); (2) Gena L. Elliot's Complaint (dckt. 1, AP No. 20-2001; and (3) Tabitha N. Adkin's Complaint (dckt. 1, AP No. 20-2002). The three cases were consolidated via Order entered on July 9, 2021, with all pleadings following that date to be filed and entered on the lead AP docket.

A trial was held in the consolidated proceedings on November 1, 2022 (the "Trial"). The transcript of the Trial was docketed on January 6, 2023. Post-trial briefing was completed January 17, 2032.

This nondischargeability matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. This matter is ready for adjudication.

## I.

### A.      Facts and Procedural History

William Warren Mucklow filed his Chapter 7 bankruptcy case on October 10, 2019. Almost immediately following the Chapter 7 Trustee's Report of No Distribution entered on December 31, 2019, the Adversary Proceedings were commenced. Although Mr. Mucklow received his Chapter 7 Discharge on June 21, 2022, he has not yet been discharged from debts that this Court may decide are nondischargeable, such as the claims at issue in the Adversary Proceedings.

After filing the Adversary Proceedings, each of the Plaintiffs, along with the Defendant, filed Motions for Summary Judgment, all of which were denied by this Court. The Trial was held on November 1, 2022, during which the Plaintiffs and the Defendant were each represented by counsel and presented argument, testimony, and evidence.

Mr. Mucklow was the President of New Beginnings Drug Treatment Center, Inc. ("New Beginnings"), and all three Plaintiffs worked for him as employees of New Beginnings.

Ms. Halstead left her position at Thomas Memorial Hospital and began her employment with New Beginnings on or around February 17, 2017. She worked as a part-time employee until April 2017, when she was hired as a salaried employee with a promised salary of

$90,000.  However, Ms. Halstead's paychecks never reflected that transition.  From April 2017 through December 2017, Ms. Halstead received either a significant underpayment from New Beginnings or was not paid at all.  In total, she calculated her underpayment at $51,823.12.

Ms. Adkins was hired by New Beginnings on April 26, 2017 as a nurse and agreed to a pay rate of $25.00 per hour.  Her employment lasted through December 31, 2017.  During all the months of her employment, Ms. Adkins was paid only three times.  She calculated that she had worked a total of 582.5 hours for New Beginnings, and her payment deficit totaled $12,481.75.  Ms. Adkins testified in support of these numbers, explaining at the Trial that she kept a detailed calendar of her work hours.  Ms. Halstead additionally testified that she believed these assertions to be accurate and she supported Ms. Adkins' claim of wage non-payment.

Ms. Elliot was hired as office manager for New Beginnings in May of 2017, and her rate of pay was $10 per hour.  She was only paid three times from the time she was hired until her departure from New Beginnings, and her pay deficiency came out to $1,500.  Ms. Elliot provided support for these numbers in her timecards, which indicated that she worked a total of 335.87 hours for New Beginnings.

On February 8, 2019, all three Plaintiffs filed Complaints in Kanawha County, West Virginia against Mr. Mucklow and New Beginnings.  Each pled the same claims: fraud in the inducement, *quantum meruit*, breach of contract, promissory estoppel, claims for unpaid wages under the West Virginia Wage Payment and Collection Act ("WVWPCA"), and they additionally put forth arguments to pierce the corporate veil.  In all three cases, neither Mr. Mucklow nor New Beginnings responded after being properly served.

Two of the Plaintiffs, Ms. Halstead and Ms. Elliot, were awarded default judgment in the Kanawha County Circuit Court against both Mr. Mucklow and New Beginnings on April 6,

2019.  Ms. Halstead's judgment was for $103,346.24, and Ms. Elliot's was for $3,000.  At that

time, Ms. Adkins had a motion for default judgment pending in her case as well.

After they were granted default judgment, Ms. Halstead and Ms. Elliot attempted

to execute on their judgments, and they obtained a Commissioner in Aid of Execution (the

"Commissioner") who attempted to take Mr. Mucklow's deposition, but he failed to appear.  Based

on that failure, the Commissioner filed a motion for contempt, and Mr. Mucklow was ordered to

appear in person at that hearing.  Yet again, he failed to appear.  Mr. Mucklow was found to be in

contempt of court, and a bench warrant was issued by the Kanawha County Circuit Court.  Mr.

Mucklow was arrested and held in jail until he completed the deposition.

Thereafter, on October 10, 2019, Mr. Mucklow filed his bankruptcy case.  At that

time, Ms. Halstead and Ms. Elliott filed their adversary proceedings seeking to have their

judgments deemed nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) or (a)(6).  And although

she had not been granted default judgment yet in her case, Ms. Adkins also filed an adversary

proceeding requesting that this Court establish the debt owed to her and additionally find that the

debt is nondischargeable under 11 U.S.C. §§ 523(a)(2) or (a)(6).

**B.      Pertinent Trial Testimony**

At the Trial, the Court heard testimony from several witnesses on behalf of the

Plaintiffs: Ms. Halstead, Ms. Elliot, Ms. Adkins, and Laura Fragale.  Mr. Mucklow testified for

the defense, along with Raymona Nesselrote.

Ms. Adkins discussed her first meetings with Mr. Mucklow; he promised to pay her

$25 per hour and promised that her position would begin as part time, but "lead into" full-time.[1]

Tr. 19–20.  Her understanding, from Mr. Mucklow's statements, was that New Beginnings was a

---

[1]   Ms. Halstead recalled a specific meeting with Mr. Mucklow and Ms. Adkins, and she
corroborated Ms. Adkins assertions during her testimony.  Tr. 60.

start-up business, but that he had six months' worth of capital from investors and sponsors.  Tr.

20.  Mr. Mucklow also indicated to Ms. Adkins that he had many grants coming in; Ms. Adkins

remembers Mr. Mucklow telling her the source of the grants, but she explained that she could not

remember the names.  Tr. 20.  Ms. Adkins testified that she relied on these representations made

by Mr. Mucklow in deciding to accept Mr. Mucklow's offer of employment at New Beginnings.

Tr. 26.  When asked for specifics on the "representations" that Mr. Mucklow made, Ms. Adkins

stated: "that he had the equity, the money, to make sure everything was going to run smoothly for

six months," and explained that Mr. Mucklow "continued to pull stuff up on computers and show

us how things were processing," specifically, "several things on the computer as to the grants that

were coming . . . ."  Tr. 51.  Regarding the grants, Ms. Adkins stated that Mr. Mucklow pulled

information up on a computer and, although "[she] didn't remember who it was through," she

remembered that "it stated that it was a fairly large sum that he was guaranteed to get, from this

grant.  It was just a matter of the money processing."  Tr. 52.  Notably, Ms. Adkins stated a second

time that Mr. Mucklow indicated to her that "it was guaranteed grant money he had been awarded

that was coming" in the amount of "hundreds of thousands of dollars."  Tr. 55–56.

Ms. Adkins outlined the agreement she had with Mr. Mucklow for her employment:

she stated that she "had a job description" and that the job "was going to be paid $25 an hour" on

a biweekly basis."  Tr. 52–53.

In terms of the structure of New Beginnings, Ms. Adkins testified that she was

asked to enter into an agreement by which she would be compensated by New Beginnings through

stock ownership instead of work hours.  Tr. 21.  Ms. Adkins ultimately turned that offer down.  Tr.

21.  Ms. Adkins also never agreed to become a corporate officer of New Beginnings, but she was

named as Vice President, nonetheless.  Tr. 21–23, Exh. 15.  In fact, she first learned of her corporate position during the Trial.  Tr. 23.

As noted earlier, Ms. Adkins kept time records of her work for New Beginnings; additionally, she had a personal calendar on which she meticulously noted her working hours.  Tr. 23–24, Exh. 3.  In explaining why she kept personal records of her time, Ms. Adkins stated that she had "random time cards," and "[she] kept track of everything because there was not a time card machine until later on in the whole process."  Tr. 33, 41, 44.  She testified that her records reflected 582.5 working hours between April 26, 2017 and December 31, 2017.[2] Tr. 44–50.  She was in fact only given three paychecks, for a total gross deficit of $12,481.75.  Tr. 25, 33–41, 42, 44; Def. Exh. 3.

Ms. Adkins admitted that she continued to work for New Beginnings even though she had not been paid accurately.  Tr. 26.  She explained that Mr. Mucklow "always had a way of expressing that payment was coming . . . [,]" and "there was one time that he stated that he could file bankruptcy and not pay, like he's done in the past to other people."  Tr. 26.  After hearing this, Ms. Adkins "felt stuck . . . because [she] felt that if [she] went against him, [she] would not get paid."  Tr. 26.  She testified that she felt "threatened" by Mr. Mucklow if she was to leave—she explained that "if [she] would leave, that it would go against him, and he would ultimately file bankruptcy, and [she] would never see the money that [she] worked for."  Tr. 27–28.

Ms. Halstead took the stand next and corroborated much of Ms. Adkins' testimony.  Ms. Halstead began by explaining her educational background and how she came to work for Mr. Mucklow; he approached her in either late 2016 or early 2017 about New Beginnings.  Tr. 61.

---

[2]  Ms. Halstead and Ms. Elliot corroborated this timeline and Ms. Adkins' work hours during their testimony.  Tr. 60, 99.

Specifically, he called her to discuss the business plans, and she agreed to meet with him shortly thereafter, even though she was working at Thomas Memorial Hospital at the time. Tr. 62. At their meeting, they discussed Mr. Mucklow's business partner, Ethel Fleming, who Ms. Halstead understood had provided quite a bit of funding. Tr. 62. Notably, Ms. Halstead testified that Mr. Mucklow made representations about the cash he had on hand; "he had enough to be able to pay through the end of the year, for salary." Tr. 63.

Based on those representations, Ms. Halstead joined New Beginnings on a part-time basis in February or March of 2017. Tr. 63. She eventually left her position at Thomas Memorial Hospital and transitioned to full-time employment at New Beginnings in April of 2017. Tr. 68. Mr. Mucklow informed Ms. Halstead around that time that he had six months of funding to keep the business running. Tr. 63.

With regard to potential grant funding, Ms. Halstead testified that Mr. Mucklow had taken her with him to a meeting with United Way; she understood that United Way was going to be handling all the grants. Tr. 63. However, Ms. Halstead did not remember whether Mr. Mucklow had represented to her that he had actually obtained a grant from United Way; she recalled later that the meeting was set up "to see what grants would be appropriate for him to apply for, at that time." Tr. 63–64, 74.

When she left her "full-time," "stable" position with Thomas Memorial Hospital—where she had health insurance and was paid biweekly—in April of 2017, she relied heavily on Mr. Mucklow's representations and the "promises" he made. Tr. 68. These representations included Mr. Mucklow's claim in July or August of 2017 that "he had another investor invest money into the company." Tr. 83.

After working for New Beginnings for a time, Ms. Halstead came to understand that Mr. Mucklow had never been awarded any grants and did not have six months of working capital. Tr. 67–68. Furthermore, billing to Medicaid had never resulted in a single payment to New Beginnings. Tr. 84. Ms. Halstead explained that she believed Medicaid had never paid out any bills because of Mr. Mucklow's arrest for "not paying the salaries to the people, previously," and "an investigation was started." Tr. 86–87. Specifically, she understood that Medicaid didn't have any issues with the services New Beginnings was providing; the issue directly related to Mr. Mucklow's "past." Tr. 87.

As with Ms. Adkins, Ms. Halstead never agreed to become an officer of New Beginnings, but she was listed as Director with the West Virginia Secretary of State. Tr. 64, Plaintiffs' Exh. 15. Ms. Halstead explained that multiple lawsuits were filed against her, as Director, and New Beginnings in Kanawha County, West Virginia seeking to recover unpaid employee wages. Tr. 65. She was eventually dismissed from the lawsuits. Tr. 65.

Ms. Halstead recalled discussing the non-payment of wages with Ms. Adkins several times, and they also discussed reasons to stay with New Beginnings versus reasons to leave. Tr. 66. Specifically, one of the reasons for staying was their patients; Ms. Halstead explained that they were "not able to abandon patients." Tr. 66. If Ms. Halstead and Ms. Adkins had left, they "would have left [their] patients abandoned, and with nowhere to go, with no other ways of seeking treatment at that time." Tr. 66. Ms. Halstead testified that they had received at least forty patients from a local physician who each had to be seen on a weekly basis for individual and group therapy.[3] Tr. 72. Furthermore, Ms. Halstead corroborated Ms. Adkins statements when she explained that

---

[3] Ms. Elliot provided support for this estimation during her testimony: she stated that she believed New Beginnings had "at least fifty to seventy-five patients." Tr. 91.

"in the past, [Mr. Mucklow] had made several statements in front of [them] that if [they] left that he would just file bankruptcy and he wouldn't have to pay us, in regards to the other people who had filed lawsuits against him." Tr. 66. Ms. Halstead considered these statements to be threats, and she took them seriously; she testified that there was an element of fear that made her stay at New Beginnings. Tr. 67.

Ms. Halstead was presented with a Service for Stock Agreement ("Halstead Stock Agreement") with New Beginnings during her testimony. Although her signature was shown on the Halstead Stock Agreement, Ms. Halstead denied ever signing the document and went on to explain that she "had been in the office of Mr. Mucklow, numerous times, where he's copied-and-pasted signatures from other people's things—specifically for MedExpress, where he's done excuses for his stepson to be excused from school." Tr. 76–77. She vehemently expressed that she did not sign the document, even though it was her signature that appeared. Tr. 77.

Ms. Halstead was asked about Ms. Elliot and how she came to work for Mr. Mucklow. Ms. Halstead explained that she had asked Ms. Elliot to "come work for him after everybody else had quit and went towards filing lawsuits against Mr. Mucklow." Tr. 69. She and Ms. Elliot had been friends for over twenty years. Tr. 70. Ms. Halstead recalled telling Ms. Elliot what Mr. Mucklow had told her: that "there was money that was coming," and they just needed to "be patient and wait for it." Tr. 71. Ms. Halstead testified that Mr. Mucklow had told her what to say to Ms. Elliot to induce her to join New Beginnings: specifically, that "there was money coming" and "if she could just come in and work, that he would ensure that she would be paid." Tr. 71.

Ms. Elliot was next on the witness stand. She told the Court that, after being contacted by Ms. Halstead, she went in and had an interview with Mr. Mucklow and discussed her

future job duties with him.  Tr. 90–91.  During that interview with Mr. Mucklow, Ms. Elliot stated

that he promised she would be paid biweekly, but her first paycheck would not come for a couple

of weeks because they were waiting on payment from Medicaid.  Tr. 92.  Although she

remembered being promised a $12 per hour rate, she ended up being paid at a $10 per hour rate.

Tr. 100.  Her employment began at the end of May 2017, and she testified that she did not know

at that point that Ms. Halstead had been experiencing issues with being paid.  Tr. 93.  Regarding

the potential for grant funding, Ms. Elliot testified that she did not remember being in any meetings

where Mr. Mucklow discussed the grants with Ms. Adkins, but she did recall "being in his office

. . . and him showing us on his computer, more than once, that, yes, . . . it was in process, it was

coming, it was pending.  You know, things like that."  Tr. 93–94.  She thought that Ms. Adkins

was present for those discussions, and that Ms. Halstead was present for some of them.  Tr. 94.

 Like Ms. Adkins and Ms. Halstead, Ms. Elliot relied on these representations made

by Mr. Mucklow when deciding to work for New Beginnings.  Tr. 98.  Specifically, she relied on

his statements that she would be paid and that money was forthcoming.  Tr. 98.

 Ms. Elliot explained that she was paid three times, "months later," and she "never

got paid again."  Tr. 95.  She also testified that, with regards to private insurance,[4] she had a "gut

feeling that maybe it had paid out, maybe once or twice," which was supported by instances when

Mr. Mucklow would "take [them] all out" to lunch "somewhere nicer," and he would "get things

for all of [them] to try."  Tr. 95.  Notably, Mr. Mucklow would pay that whole bill for the group

---

[4] Ms. Elliot testified that she believed approximately ninety percent of New Beginnings' patients
billed to Medicaid, but ten percent billed to private insurance.  Tr. 92.  She has this knowledge
because Mr. Mucklow trained Ms. Elliot on New Beginnings' billing system, and she entered the
billing sheets from the therapists into that system.  Tr. 92.

of approximately seven or eight people.  Tr. 95–96.  This occurred during the time that Mr. Mucklow was not paying salaries.  Tr. 96.

Ms. Elliot confirmed that she never agreed to work for free, even though she knew her first paycheck would be delayed, and she never made any agreement to accept ownership in New Beginnings in lieu of payment.  Tr. 96.  Ms. Elliot also testified that she had never agreed to serve as Secretary for New Beginnings, despite the Secretary of State's website reflecting the same. Tr. 96–97.

Ms. Elliot's testimony was consistent with that of Ms. Adkins and Ms. Halstead regarding Mr. Mucklow's threats about filing bankruptcy: she testified that Mr. Mucklow told her that if she were to quit, he would declare bankruptcy and no one would get paid.  Tr. 97.  She understood that statement to be a threat, and she explained that she stayed at New Beginnings because she "had already worked for the money, why wouldn't [she] stay to get it?"  Tr. 97.

One of Ms. Elliot's job duties was collecting everyone's timecards and passing them to Raymona Nesselrotte.  Tr. 101.  Ms. Elliot continued to give timecards to Ms. Nesselrotte through December of 2017.  Tr. 101–02.

Like Ms. Halstead, Ms. Elliot was presented with a Service for Stock Agreement with New Beginnings (the "Elliot Stock Agreement").  While she vehemently testified that she never signed the Elliot Stock Agreement, she recognized her signature on the document.  Tr. 105–06, 111.  She explained that Ms. Halstead warned her not to sign the document, so she declined to sign it.  Tr. 106, 112.  Ms. Elliot reminded the Court that, "as was stated previously, we do know that Mr. Mucklow does copy-and-paste signatures."  Tr. 106.

The Court finds each of the Plaintiffs' testimonies to be credible.  Each of the Plaintiffs testified to generally the same facts, and all were consistent with each other.  They

answered questions directly and did not display any behavior on the witness stand that would cause the Court to question their honesty.

   The final witness for the Plaintiffs was Ms. Laura Fragale.  Ms. Fragale was recruited by Mr. Mucklow from her full-time work as the Director of Nursing at Highland Hospital to help him open a drug detox program in May of 2017.  Tr. 116.  She was to be the Director of Nursing for New Beginnings.  Tr. 116–17.  Ms. Fragale was one of the first individuals hired by Mr. Mucklow, and she recalled discussing New Beginnings' funding with Mr. Mucklow.  Tr. 117.  Mr. Mucklow told Ms. Fragale that he had "several backers," and she had attended a meeting at United Way because "they had received funding from the federal government to use for . . . the creation of drug programs."  Tr. 117–18.  Mr. Mucklow eventually let Ms. Fragale know that the United Way funding looked "very promising, that they would be receiving the money."  Tr. 118.  Mr. Mucklow made the same representations to Ms. Fragale that he made to the Plaintiffs— that he had enough money to run New Beginnings for six months; Ms. Fragale also relied on those representations in accepting a position herself and in recruiting others to come work for New Beginnings.  Tr. 118–19.  Ms. Fragale eventually discovered that Mr. Mucklow's statements about the United Way funding and six-months' funding were false.  Tr. 119–20.  She became tremendously embarrassed when the individuals she recruited began asking her about why they weren't getting paid.  Tr. 120.

   Ms. Fragale testified that she witnessed Mr. Mucklow promising that the Plaintiffs would be paid around fifteen times.  Tr. 120.  In her opinion, and based on her observations, Ms. Fragale thought that the Plaintiffs relied on these statements.  Tr. 120.  Additionally, Ms. Fragale explained that she, along with multiple other individuals, have not yet been paid by New Beginnings.  Tr. 121.

Ms. Fragale terminated her employment with New Beginnings the second or third time Mr. Mucklow could not make payroll. Tr. 122. She explained to Mr. Mucklow why she was leaving, and he offered her a Service for Stock Agreement, which she refused to sign. Tr. 122.

Ms. Raymona Nesselrotte took the stand for the defense. She worked, and still works, for U.S. Tax and Financial Company— another entity owned by Mr. Mucklow. Tr. 130. Ms. Nesselrotte performed payroll functions for New Beginnings from the beginning to the end of its operations, which she testified was in August of 2017. Tr. 130–31. Ms. Nesselrotte also viewed the bank statements and did general accounting for New Beginnings. Tr. 131. She explained that the payment system operated on a timecard basis; she received timecards from New Beginnings employees at the U.S. Tax and Finance Company office location and processed them. Tr. 132. Although she believed the employees were to be paid biweekly, she could not fully remember. Tr. 132.

At the time she performed these duties for New Beginnings, paychecks were written by hand. Tr. 133. Ms. Nesselrotte would write the checks and give them to Mr. Mucklow, who would then sign and deliver the checks. Tr. 133–34. She did later admit that she could not guarantee that Mr. Mucklow signed these checks and handed them to the New Beginnings employees. Tr. 150–51. Ms. Nesselrotte explained that she did not look at the New Beginnings bank records every day, but she had looked and saw that there was money in the bank at some point. Tr. 134. The statements Ms. Nesselrotte viewed were monthly paper statements; she did not check the online banking information. Tr. 152.

However, Ms. Nesselrotte also testified that "[t]here was an occasion once . . . one check, that [she] thought there was money in the bank, but money had been withdrawn from the checking account without us knowing about it." Tr. 134–35. She confirmed that she only

remembered that occurring on one occasion.[5]   Tr. 135.   Generally, when she wrote checks, she "thought at the time that there was money in the bank," and she never intentionally wrote a bad check.  Tr. 135.  Mr. Mucklow told Ms. Nesselrotte that they would "all be paid if there was money in the bank . . . ," but, "if there wasn't money in the bank account, we couldn't issue the check to them and let them cash it."  Tr. 144.   Ms. Nesselrotte explained that Mr. Mucklow only told her to not pay someone if there wasn't money in the bank, and to her knowledge, he never took money out of the bank so that there weren't sufficient funds for payroll.  Tr. 136.   However, she also admitted that the New Beginnings checks were located in the office, and Mr. Mucklow had access to write checks himself.  Tr. 136, 150.  When it came to the New Beginnings bank account, Ms. Nesselrotte did not have signatory authority; Mr. Mucklow possessed that power alone.  Tr. 149–50.

When asked about Ms. Adkins specifically, Ms. Nesselrotte testified that she did not remember failing to pay Ms. Adkins if she had submitted a timecard.  Tr. 138–39.  Rather, Ms. Adkins was "paid, maybe it was a little bit late, because there wasn't money in the banking account, but the checks were wrote [*sic*]."  Tr. 139.  And, with regard to Ms. Adkins' payments, "if the time card came in, she was paid, to my knowledge."  Tr. 143.  But, Ms. Nesselrotte later admitted that she could not remember a specific time that Ms. Adkins handed a time card to her.  Tr. 149.  She did state that she believed New Beginnings stopped paying salaries at the end of August of 2017.  Tr. 139.  It was at that time that New Beginnings was shut down because its operating license was revoked.  Tr. 140.  Ms. Nesselrotte testified that no timecards were issued following August of 2017, but when asked whether she got timecards after August of 2017, she stated "[t]he time cards

---

[5]  This is contradicted by Ms. Halstead's testimony: she stated that Ms. Nesselrotte herself was not being paid and that payroll checks were not being written at that time.  Tr. 85–86.

that came in, [*sic*] that wasn't paid, no, sir, I don't remember that."  Tr. 140.  Later during her

testimony, when asked whether she received timecards from September to December of 2017, Ms.

Nesselrotte said she did not remember, but that timecards generally came in, they were kept in the

filing cabinet, and she once had all those records.  Tr. 143.  Eventually, when asked if she could

guarantee that not a single check was written for New Beginnings after August 31, 2017, Ms.

Nesselrotte admitted that she could not and that she did not remember.  Tr. 156–57.  She

furthermore stated that she had seen a New Beginnings check dated either November 4th or

November 7th at a "lawyer's office" that was for time owed in August of 2017 and it was made out

to Ms. Adkins.  Tr. 158.  The applicable check stub was located in Plaintiff's Exh. 1 and was dated

November 17, 2017; it had been computer-generated, not handwritten, and Ms. Nesselrotte could

not verify that the check had been delivered.  Tr. 160–62.  Additionally, she was directed to a New

Beginnings check dated December 1, 2017 for the time period of November 12, 2017 through

November 25, 2017.  Tr. 166.  But Ms. Nesselrotte again could not confirm that the check was

ever signed or delivered.   Tr. 167–68.

      Ms. Nesselrotte remembered doing some of the billing work for New Beginnings,

including billing to Medicaid.  Tr. 140.  She explained that invoices went out, but none were ever

paid."  Tr. 140.  She could not honestly remember if any private insurance payments came into

New Beginnings.  Tr. 148.  But Ms. Nesselrotte noted later that when insurance money came in,

the funds went into the New Beginnings checking account.  Tr. 151.

      With regard to her memory, Ms. Nesselrotte testified that she has had "a lot of

problems."  Tr. 133.  She explained that she was eighty years old and that she was in a heightened

emotional state at the time of her testimony because she had suffered from heart problems and her

husband was dying of cancer.  Tr. 147.  Additionally, Ms. Nesselrotte had been experiencing a

series of small strokes since 2016 or 2017, and she admitted that they had affected her memory. Tr. 147–48. Ms. Nesselrotte also explained that she was nervous and didn't "want to say something or do something illegal." Tr. 147.

In all, the Court did not find Ms. Nesselrotte's testimony convincing or credible. Through no fault of her own, Ms. Nesselrotte has experienced significant memory problems since 2017. She appeared confused and very flustered while on the witness stand, and appeared to be afraid of making a mistake or saying something incorrect, especially with her current employer[6]— Mr. Mucklow—in the courtroom, sitting at the defense table. Her main goal in testifying appeared to be defending her accounting practices rather than providing answers to the specific questions asked by counsel. Because of these circumstances, as well as the emotional distress she experienced at Trial, the Court affords very little weight to Ms. Nesselrotte's often contradictory and confusing statements.

Mr. Mucklow took the witness stand last. He gave some background to the establishment of New Beginnings, of which he was owner and responsible officer. P. 178–80. The license was issued, and New Beginnings actually opened in March of 2017. Tr. 183.

Mr. Mucklow confirmed Ms. Adkins' testimony that New Beginnings had some patients with private insurance, but that most were relying on Medicaid. Tr. 180. There was an initial investment into New Beginnings of $290,000, which was used to pay for initial operating expenses like painting, mattresses, paper, toner, televisions, and cleaning. Tr. 180–91.

With regard to receiving grant money, Mr. Mucklow explained that the potential grant money had never been intended for New Beginnings, but a second entity—New Beginnings Foundation (the "Foundation")—he had set up as a 501(c)(3) corporation at the same time to "get

---

[6] Tr. 174–75.

some grant money to help support and foster people after they were going through the process of rehab." Tr. 181.  He admitted that the Foundation never received any money and never did any business, and that no application was ever made for grants from United Way.  Tr. 181–92.  While there had been a meeting with United Way, no application ever made.  Tr. 182.  Mr. Mucklow explained the disconnect between himself and the Plaintiffs as follows: "[i]t was our intention to apply for grant money, and there was certainly plenty of grant money available, but no grant money was ever applied for," and "[w]e had a sufficient amount of money, initially, coming in to get our business up and going."  Tr. 182.

New Beginnings received some private insurance checks totaling less than $5,000, all of which were deposited into the New Beginnings' bank account.  Tr. 184.  But, "[t]he checks that came in, that funded payroll services, both before and after we had to shut down, came from investors."  Tr. 184.  Mr. Mucklow explained that New Beginnings "ran out of money" after a second investor pulled out at the end of May 2017.  Tr. 185.  He stated that the "account had been stripped" and "it was a surprise," so he told the employees that he would "work and do what [he] could to see that they got paid."  Tr. 185.  At that point, most of the employees left New Beginnings and filed complaints with the Department of Labor.  Tr. 185.

However, New Beginnings got "going again" in July of 2017 once Mr. Mucklow picked up another investor.  Tr. 186.  However, Mr. Mucklow testified that he expected the Medicaid claims to pay out at that point, but he "still hadn't gotten an answer back from the State as to what was going on, why they hadn't paid out . . . ."  Tr. 185.  And then, New Beginnings got "into trouble" with the Department of Health and Human Resources ("DHHR") based on an application Mr. Mucklow had made—they stated that he had not "answer[ed] it correctly," so the State was not going to pay out the Medicaid claims.  Tr. 186.  Eventually, New Beginnings had its

license fully revoked and no patients were seen at the end of August.  Tr. 186.  The corporation

stayed open to take care of "residual bills and things."  Tr. 186.  Mr. Mucklow said that they "were

going to appeal" the issue with the DHHR application, but "it didn't happen."  Tr. 189.  New

Beginnings officially closed in December of 2017.  Tr. 198.

    When asked about the specific reasons why the DHHR revoked New Beginnings'

license, Mr. Mucklow admitted that it had to do with his criminal history.  Tr. 191.  Specifically,

one question on the application required Mr. Mucklow to state whether he had any "current

misdemeanors."  Tr. 191.  Despite the fact that Mr. Mucklow readily admits he has "two

misdemeanor charges that [he] had served and things for battery," he answered falsely that he did

not have any misdemeanors or felonies, due to how he "understood the question."  Tr. 191.  He

then stated that he did indeed appeal to the DHHR over this, although he had just admitted that he

was going to appeal the issue but never actually did.  Tr. 189, 191.

    With regard to the wages owed to Ms. Adkins, Mr. Mucklow explained that it was

brought to his attention later in 2017 that she "had not been paid for a couple of expenses, and she

turned those time cards into [Ms. Nesselrotte], and [Ms. Nesselrotte] issued the check, which I

signed, I believe, and sent to her."  Tr. 193, Def. Exh. 3.

    When asked if he had told the Plaintiffs time and again that he would pay them,

Mr. Mucklow stated that "[i]t was . . . [his] belief, wholeheartedly, and theirs, because they saw

the . . . billing system as to how much was due to pay out."  Tr. 193.  When asked if he told them

that they were absolutely going to get paid, Mr. Mucklow stated that he "told them [he] believed

that they were going to get paid because [he] believed that [they were all] going to get paid."  Tr.

195–96.  He denied using funds for purposes other than wages, stating that "wages came before

anything else" and denied intentionally, maliciously, or willfully not paying the Plaintiffs.  Tr.

194–96.  Mr. Mucklow stated that the reason the Plaintiffs were not paid was because "[New Beginnings] had no money" from "the work that was performed."  Tr. 198.

Mr. Mucklow discussed his threats about filing bankruptcy, explaining that he had been speaking with the employees who had filed complaints with the Department of Labor trying to explain that he was trying to raise money to pay them, and "they were just eating [him] alive, as the press was as well.  And [he] got very frustrated and [he] said, 'Well . . . what happens if I just go file bankruptcy?'"  Tr. 197.

When pressed about whether he had paid Ms. Adkins, the following discourse occurred between Counsel for the Plaintiffs and Mr. Mucklow:

Q:    Okay.  And, you know, you—with regard to Ms. Adkins, let's start with that, Okay?  You have known, as early as when she filed her complaint in Circuit Court, in 2019, that she was saying she didn't get paid; correct?

A:    Correct.

Q:    Okay.  Now, having known that, between when she filed her complaint, in February of 2019, until getting ready for this trial for this federal judge, you say she was paid.  In any of that time, you could have given your counsel documentation, with canceled checks, you know, from the bank, to show she was paid, but you haven't done that, have you?

A:    Well, yes, I have.

Q:    No, you haven't.  Do you have –

A:    Yes, sir.  You're answering my questions or me.  Are you going to let me answer the question?

. . . .

Q:    Do you have evidence that she was paid today?

A:    Every check that was paid to Tabitha Adkins was submitted to counsel, to be submitted in for this – for this hearing.

Q:    Okay.  So you say [your counsel] did not present them to the Court?

A:     I'm not sure whether [my counsel] presented them or now. I looked and [*sic*] see, they were gone over, those checks that were written to her.

Q:     Okay.  Well, you realize we haven't seen them today; correct?  You've been sitting here all day.

. . . .

A:     For most of the day, yes.

Q:     Okay.   And when Ms. Adkins was on the stand, and questioned by [your counsel] did he ever present to her canceled checks that said, ["]you've been paid, you shouldn't be here?["]

A:     I don't remember that having happened.

Q:     Because it didn't happen; correct?

A:     I guess—I suppose not.

Q:     Okay.  Well, I mean, you run a tax office that keeps records.

A:     Yes, I do.

Q:     And it's pretty simple to get a canceled check to show someone's been paid, isn't it?

A:     That's right.  But if the person has filed, and saying they were due money for a period of time when the business was not actively seeing patients, which we weren't even licensed to do, its impossible to show a canceled check for work that wasn't earned.

Q:     Okay. So—but for the time that she did work, also—for the times [*sic*] it April, May, June, July, August, those hours, you could have presented those checks to this Court today, couldn't you?

A:     April, May, June, July, [*sic*] many of that time, Tabitha Adkins was off on sick leave, and she was ill.  She did not work full-time for New Beginnings.

Q:     What documentation have you provided to this Court to demonstrate that?

. . . .

A:     Tabitha Adkins, like every other employee, submitted pay timecards to be paid, which were then calculated by Raymona Nesselrotte.   And then checks were generated for that.   If we received a pay stub that needed to be taken care of, then a check was issued and submitted.  As we did when we found out a few that had

not been paid, later on in the fiscal year, we submitted a couple of checks to her for that reason.

Q:      Going back to my question.  What documentation have you provided to this Court, today, that shows she was off on sick leave and didn't deserve to be paid?

A:      Sir, she testified that she was off with illness, if my memory—

Q:      She is here complaining that you did not pay her for hours worked, and you could have brought—produced documents showing that she was paid, and that she was off for sick leave, and you've produced none; correct?

A:      I was under the impression that we had presented that, so I—we presented some papers and reports that showed the check numbers and the amounts.  I think there were three checks that were drafted to her in August of that year.

Q:      Okay.  So you have not shown this Court any documentation that she was off on sick leave or not—or paid, in April, May, June, or July; correct?

A:      My only—my only response—and that is correct, that is correct.  My only response to that is, though, if she wasn't getting paid, and she got paid in August, why did she wait so long to submit anything?  We don't—anything that she submitted, we saw that it got taken care of.

Tr. 201–05.

Mr. Mucklow provided information about an additional financial issue, an additional bank account for New Beginnings, and accusations he has faced about his own malfeasance:

Q:      Okay.  Is there any other financial issue – major financial issue, that occurred that caused you to be unable to pay payroll?

A:      In the course of the time frame, for end of May was when we had—we expected to have a hundred-thousand dollars in the bank account that we—that had been deposited there.  It had been subsequently pulled out of the bank account and—not to our knowledge—and we found out that that had occurred. . . .

. . . .

Q:      Let's go back.  You say a hundred-thousand dollars was in the account and removed without your knowledge.  Why don't you tell the Court what happened to that hundred-grand.

A:      There was a secondary account, a Fifth Third account.  We had Dr. Kalou, who was a—going to be an investor.  And he was in there early on, and we didn't start the operation of New Beginnings until he gave the go-ahead that he was ready to start working with us.  And he did that.  He gave us – he met with many of the principals at his own office in Kanawha City, and told us, 'Yes, we're go, and I'll see the patients,' and that's—we went ahead and moved forward. Had I known that Dr. Kalou intended to pull his money back out at that time, I would have never started to see patients to have to start paying payroll.  So here I come, and I still had operational money in the Chase account, in the general account, and I was paying paychecks out there through March, April, and through the end of May.  And the end of May, then, if I recall correctly, we discovered that the hundred-thousand dollars was not in there, and had been pulled out by Dr. Kalou, who we then—who then contacted us after an hour, after I told the employees that he was not going to—we weren't going to be able to pay them.  He contacted us and he said, 'well, let's see what we can do,' and made me an offer of wanting to go ahead and take over the business.  And I have all of that on tape.  But, in any case, so I told this to [Ms. Halstead and Ms. Adkins]—[Ms. Elliot] was not involved yet, then—and showed them copies of the Fifth Third statement, with the money in it, and the money out then, too, and explained to them what was going on.

Q:      Okay.  So Dr. Kalou had access to the New Beginnings bank accounts?

A:      Had access to 'a' New Beginnings bank account at Fifth Third because that's where he banked, and he felt comfortable doing that.  And Kim Squire, his banker, met with me in Cross Lanes and set the account up and—and everything was fine, to our understanding, to my understanding.

Q:      Okay.  So as we sit here today, are you telling the Court that that hundred-thousand dollars was Dr. Kalou's money, for him to do with as he pleased?

A:      Once he put the money in New Beginnings' account, no, it wasn't.  Once he put that in there, that deposit was made.  And, under FDIC laws, after I spoke with the federal government about this, it should not have been received [*sic*]. But we missed the statute of limitations to go after, per FDIC insurance, to go after that.  Dr.

Kalou had also signed an agreement to purchase stock for one-third of the company on that. He had Kim Squire go ahead and pull that money out, and that's—that's where we stand at that point. We did not have that money to pay those employees with, which caused me then to struggle for about three or four weeks to get some subsequent money in, so I could pay those employees, which I did.

Q:     Okay. Do you recall my deposing you on December 6, 2019?

. . . .

A:     I do.

Q:     Okay. Do you remember discussing the hundred-thousand dollars with regard to Dr. Kalou?

A:     I do.

Q:     Okay. And you actually referred to the fact that he had 'stolen' a hundred-thousand dollars from the corporate account; is that correct?

A:     That's what the FDIC people said. Technically, it was stealing because it was corporate assets and not his assets, once they were deposited into the account.

Q:     Well, actually, that's what you said, too. You testified that he stole—

A:     Well, that's my understanding of the way that works, is that once it was put into the corporate account and posted by the bank, that it was corporate—they were corporate assets.

Q:     And as I asked you then, I'll ask you now, when was the criminal complaint filed?

A:     We did not file a criminal complaint. We went after—we waited—I didn't know that there was any recourse that we could do after that. I went and approached about filing a criminal complaint, but I was told that in order to collect FDIC insurance on this . . . there's a time limit for 90 days . . . . The same time, then I hired an attorney named Trent Redman . . . and Trent started to get some people involved . . . I mean, an attorney who specializes in banking and UCC Code . . . we met with him, and he was doing some work on deciding to file a civil suit against Fifth Third Bank and against Dr. Kalou. And that's—that's still in the works as of today.

Q:     Okay. Does Trent Redman still represent you today?

A:      He does not.  He cancelled off as counsel. He did not.  He did not.

Q:      Going back to the hundred-thousand dollars, you had a hundred-thousand dollars that you say was stolen from you, but you never, to this day, have filed a criminal or a civil complaint; correct?

. . . .

A:      That's correct.

Q:      Okay.   And you were in business with Trent Redman; correct?

A:      I was in business with Trent Redman for a short period of time, yes.

Q:      That was for the Safe Haven Corporation; correct?

A:      That's correct.

. . . .

Q:      Okay, what soured that relationship?

A:      Trent Redman and I had problems with—I was taking care of Trent Redman's paying—payments for Trent Redman and his partner, and we went back and forth. . . .  The problem with—with that was—is that Trent thought that I was taking money out of the business account, and putting it in—towards my—but he didn't understand that the business expenses were going—those were business expenses that had to be made to keep the house going.  And he—he hired counsel on that, to try to go after that.  We went back and forth with that, and nothing has ever come of that.

Q:      Okay.   There was an allegation that you took funds, electronically, out of the accounts of the law offices of Redman and Payne, to Pay Safe Haven Corporation bills; correct?

A:      There—the reason that money was taken out of Redman and Payne, to pay Safe Haven Corporation, is because it was owed. Now, that had to be paid, and Trent Redman maintained his office space in my building for a period of time.  And he had to pay the rent for that.   So yes, he—there's money that came out electronically, to go towards the bills that he owed.

Q:      So, yes, without the knowledge of Michael Payne and Trent Redman, you took funds out of the account of the Law Offices of Redman and Payne, and paid Safe Haven Bills?

A:      It—it was agreed that they understood that they would be paying a rental payment.  Those payments were paid into Safe Haven Corporation.  And those—those payments went for the utilities of the facility that they operated in.

Q:      But you, electronically, without telling Trent Redman and Michael Payne, took money out of the accounts, the Law Offices of Redman and Payne, and paid Safe Haven Corporation?

A:      No, Sir.

Q:      Okay.  Have you ever obtained services from anyone under false pretenses?

A:      Obtained services under false pretenses?

Q:      Yeah.  Made a misrepresentation to someone to get them to do something for you?

A:      Not intentionally.

Q:      Okay.  Well, let me—you brought up, in your direct examination  .  .  .  that you have two misdemeanor battery convictions; correct?

A:      I do.

Q:      And that is for complaints that were made by a woman named Lisa Allen, and a woman named Debbie McCoury; correct?

A:      That's correct.

Q:      Okay.  And with regard to Ms. McCoury and Ms. Allen—

A:      Yes.

Q:      —you were posing as a mentally retarded person with the mind of a three-year-old?

.  .  .  .

Q:      And with regard to Ms. Allen and Ms. McCoury, you had them coming in to your home, and you were pretending to be a mentally retarded person, with the mind of a three-year-old child; correct?

A:      No, that's how it was in the paper.  But—but, for the sake of your question, sir.  I, myself . . . have mental illness issues . . . .  Yes, I made some bad judgment calls when I was sick and suffering from many different seizures.  I also have epilepsy.  And I made some bad decisions.  Yes, I did.  I was charged with two counts of battery for

groping these womens' breasts. I don't recall having done that, but
I pled guilty to that . . . . And yes, I did—I did pose on the telephone
as my mother, wanting to get help, which those people were then
paid and came back, numerous times, even after they were aware of
what the situation was.

Tr. 206–18.

When asked about the Elliot Stock Agreement and Halstead stock agreement, Mr.

Mucklow discussed other forgery accusations leveled against him:

Q:  Okay. Have you ever been accused of forging someone's
signature to obtain funds from a bank?

A:  There was an incidence in—around 2000, 2004, somewhere,
where a partner of mine claimed I had—I had put his signature on
an application for a loan with First State Bank, I believe.

Q:  Was that person Norman Chill?

A:  Yes, it was.

Q:  Okay. And this is not your first time in bankruptcy court;
correct?

A:  This is my second bankruptcy, yes.

Q:  Okay. And this is not your second adversary proceeding
dealing with the dischargeability of a debt; correct?

A:  It is—it is not.

Q:  And with regard to the—it was actually a line of credit at
First State Bank, in the about of $25,000; correct?

A:  I believe that's correct, yes.

Q:  Mr. Chill alleged that he confront—the money was—there
was money taken out of the account, in large sums, and that he
confronted you and you stated, when he asked how it was done—

A:  Uh-huh.

Q:  —'Your name is on all kinds of documents. There is a
process called cut-and-paste, that's how I did it.' Correct?

A:  That's what he said in the transcript, I believe, yes.

> Q:    Okay.    And that was actually incorporated into a final nondischargeability order, signed by Judge Pearson, in the Southern District of West Virginia, on July 17, 2008; correct?
>
> A:    That's correct.
>
> Q:    And that debt was found to be non-dischargeable; correct?
>
> A:    That's correct.

Tr. 221–22.  When questioned by his own Counsel, Mr. Mucklow explained that he had presented the Stock Agreements to all the New Beginnings employees, and he remembered Ms. Halstead "filled out the top" of the form, but he did not "recall having seen her sign that . . . ."  Tr. 225–26. Nevertheless, he claims he received all the Stock Agreement forms the employees had completed and signed and dated them.  Tr. 225–26.  He stated that neither Ms. Halstead's signature nor Ms. Elliot's signature on the Stock Agreements was cut-and-pasted.  Tr. 225–26.  Notably, the Stock Agreements that were presented to the Court were not originals of the Stock Agreements with wet ink signatures; Mr. Halstead explained that he had "a ton of [the forms] come in from about 25 employees that signed them, and they were all . . . scanned in for record-keeping purposes."[7]  Tr. 227–28.

Plaintiffs' Counsel also asked Mr. Mucklow about statements printed in a newspaper article wherein he was purported to have discussed filing for bankruptcy protection to avoid his New Beginnings payroll debts:

> Q:    [Discussing and reading from Pl. Exh. 9] I'll purport to you, this is a story where it talks about the State was investigating claims 'after' the Department of Labor got involved.  And at the end of the story, it says, 'Mucklow, referring to employees affected by the recent layoffs, said, quote, '[i]f I wanted to be a real a' and then there are several blanks, 'I'd go file bankruptcy on there and they'd not see a penny.''  Did I read that right?

---

[7]  The Court stated that it would admit the documents into evidence if Mr. Mucklow produced the wet-ink, original documents.  A deadline was set for the submission for those papers, but they were never provided to the Court.  Thus, the Stock Agreements were not admitted into evidence.

A:      You read it right.

Q:      And that's the statement that you made to the West Virginia
Gazette, when they were looking into—

A:      Giuseppe Sabella did not get that from me, directly.  And,
subsequently, the Gazette then filed bankruptcy, after that, or I
would have sued for incorrect there.  But that—I did not, Mr. Sabella
doesn't work with the Gazette anymore.

Tr. 224.

One of the final parts of Mr. Mucklow's testimony involved a disagreement

between him and his own counsel:

Q [Court]:      All right.  And then, when did you end up hiring Mr.
Hamrick?

A [Mucklow]: Mr. Hamrick's been on retainer for me since 2009.
He's been my attorney for many years.[8]

Q [Court]:      Okay.  So is there—and please don't give me any sort
of, you know, privileged information—was there a reason that you
didn't go to Mr. Hamrick to answer the suits in state court?

A [Mucklow]: Yes, I did, actually, go and seek Mr. Hamrick out,
but he wasn't able to take the case at that time.  He told me he
wasn't—he had—he was too bogged down with his dockets . . . .

. . . .

Q [Griffith]: Mr. Mucklow, after you had—after default
judgments had been entered against you in the Circuit Court of
Kanawha County, execution on those default judgments began;
correct?

A [Mucklow]: Yes.

Q [Griffith]:    Writs filed and subpoenas were sent out; correct?

A [Mucklow]: Yes.

Q [Griffith]:    And you were—you received a subpoena to appear
before a Special Commissioner . . . correct?

A [Mucklow]: Yes.

---

[8]  Mr. Mucklow later clarified that Mr. Hamrick was on retainer for New Beginnings, not for Mr.
Mucklow individually.  Tr. 244.

Q [Griffith]:     And you ignored that subpoena; correct?

A [Mucklow]: [Stricken from the record].

. . . .

Court:        Mr. Hamrick, I will strike the response from the record, as far as it contains discussions between you and your client. All that I will allow it to read on the record is simply that it was on advice of Counsel Hamrick.

Mr. Hamrick:  It was not on my advice.

. . . .

Q [Hamrick]:  Mr. Mucklow, just to clear things up.  You didn't hire me until you got arrested and put in jail, and I got you out.  Is that what happened?

A [Mucklow]: When you—

Q [Hamrick]:  I was not on your—

A [Mucklow]: You were there only to represent New Beginnings, not to represent me.  And you made that very clear at the time when I was deposed, yes.

Q [Hamrick]:  Thank you.

Tr. 237–40.

The Court does not find Mr. Mucklow's testimony credible.  He has a clear history of deceptive practices, both financial and otherwise.  His testimony often contradicted itself, and he very rarely answered questions clearly and concisely, which this Court considers a hallmark of truthfulness.  It is inconceivable that this Court would take word of an individual who, having two misdemeanor battery convictions on his criminal record, would answer in the negative when asked on an official form if he had either felonies or misdemeanors in his background.

Mr. Mucklow's testimony with regards to the "stolen" funds in the amount of $100,000 strained credulity, and his physical presence on the stand while being cross-examined bordered on hysterical.  Mr. Mucklow was not even honest when discussing his own counsel and the advice of his counsel; Mr. Hamrick was prompted to examine his own client to clear up the

confusion Mr. Mucklow had caused.  And, from the testimony presented about Mr. Hamrick and

his representation, it appears that he represented New Beginnings and remained on retainer with

New Beginnings even while New Beginnings did not have funding to pay its own employees.[9]

## II.

### A.      Applicable Law and Analysis

While Ms. Halstead and Ms. Elliot were able to obtain default judgments in state

court against Mr. Mucklow, Ms. Adkins' case did not proceed that far.  Therefore, for Ms. Adkins,

the Court must first address whether she is owed damages under the West Virginia Wage Payment

and Collection Act.

### 1.      Ms. Adkins' Debt

Pursuant to the WVWPCA, which "applies to all employees in West Virginia and

provides rights and remedies with regard to payment of wages,"

> [w]henever a person, firm, or corporation discharges an employee,
> or whenever an employee quits or resigns from employment, the
> person, firm or corporation shall pay the employee's wages due for
> work that the employee performed prior to the separation of
> employment on or before the next regular payday on which the
> wages would otherwise be due and payable.

*Grim v. E. Elec., LLC*, 234 W. Va. 557, 571, 767 S.E.2d 267, 281 (2014); W. Va. Code § 21-5-

4(b).  In other words, the "[WV]WPCA requires an employer to pay its employees regularly while

employed, and in full at the separation of employment."  *Grim*, 234 W. Va. at 571, 767 S.E.2d at

---

[9] There was testimony at the Trial about an entity called Phoenix Counseling Services
("Phoenix").  Specifically, Mr. Mucklow attempted to convince the Court that Phoenix was run
by Ms. Halstead and that the Plaintiffs actually began working for that company in September of
2017, contradicting their statements that they worked for New Beginnings through December
2017.  The Plaintiffs explained that, yes, Phoenix did exist, but they did not begin working for
the new entity until January 2018.  There was no evidence introduced to indicate that the
Plaintiffs were paid by Phoenix during any part of 2017, and the Court considers this discussion
point a red herring.

281.  If those wages are not paid in accordance with § 21-5-4(b), then entity owing the wages, "in

addition to the amount which was unpaid when due, is liable to the employee for two times that

unpaid amount as liquidated damages." W. Va. Code § 21-5-4(e).  Importantly,

> [a]lthough the Wage Payment and Collection Act does not explicitly
> impose liability on corporate officers, it is clear from a reading of
> W. Va. Code § 21-5-1(h) that the Legislature intended to impose
> liability on officers in the management of a corporation who
> knowingly permit their corporation to act in violation of the
> provisions of the Act. . . .
>
> . . . .
>
> . . . Thus, through the Wage Payment and Collection Act it is
> contemplated that corporate officers may not hide behind the
> corporate skirt to escape liability for their unlawful mischief.

*Mullins v. Venable*, 171 W. Va. 92, 94–95, 297 S.E.2d 866, 869–70 (1982); *see also Walters*

*Construction Inc. v. Cook (In re Cook)*, 361 B.R. 815, 818 n.3 (Bankr. N.D. W. Va. 2007).

Therefore, Ms. Adkins is only required to demonstrate that she worked for New Beginnings, that

she was owed wages at the time she ceased her employment with New Beginnings, that she was

not paid a portion of those wages, and that Mr. Mucklow was an Officer of New Beginnings such

that he is subject to individual liability under the WVWPCA.

First, it is clear that Mr. Mucklow was an officer of New Beginnings and that he is

personally liable for any wages owed to Ms. Adkins that fit within the WVWPCA; he admitted so

in his testimony.  Tr. 178–79.

Moving to the wages owed to Ms. Adkins, the Court finds that she should have

been paid the gross sum of $14,562.50 for her 582.5 hours of work, and she was only paid

$2,080.75, leaving a deficit of $12,481.75.  She was hired to work at New Beginnings at a rate of

$25.00 per hour and was to be compensated on a biweekly basis.  Ms. Adkins testified credibly as

to the hours she spent working for New Beginnings; she kept a detailed personal diary of her time,

and her records were supported by both Ms. Halstead and Ms. Elliot.  Furthermore, although Ms.
Nesselrotte testified, despite her memory issues, that she believed she had written payment checks
to Ms. Adkins, Mr. Mucklow has never provided books, accounts, cancelled checks, check
registers, or any other physical evidence to support his claims that Ms. Adkins received full
payment for the hours she worked.  Even if Ms. Nesselrotte was correct that she had written checks
out to Ms. Adkins, there is no guarantee that those checks were signed and given to Ms. Adkins;
Mr. Mucklow was solely responsible for performing that duty.

Therefore, this Court finds that, pursuant to the WVWPCA, Ms. Adkins possesses
a claim against Mr. Mucklow, individually, for $24,963.50.  The next determination the Court
must make is whether the WVWPCA judgments held by Ms. Adkins, Ms. Halstead, and Ms. Elliot
are nondischargeable in bankruptcy under either 11 U.S.C. §§ 523(a)(2) or (a)(6).

## 2.    Nondischargeability

This Court has previously ruled that Ms. Halstead and Ms. Elliot's state court
judgments, while they established the amount of the debts owed by Mr. Mucklow, did not include
the requisite findings for application of *collateral estoppel*.[10]  Thus, this Court must now decide
whether the obligations owed to all three Plaintiffs should be deemed nondischargeable under
either 11 U.S.C. §§ 523(a)(2) or (a)(6).

Generally, to exclude a particular debt from discharge, pursuant to Section 523(a),
a creditor must demonstrate, by a preponderance of evidence, each element of the subsection.
*Garner v. Grogan*, 498 U.S. 279, 291 (1991); (*see also TKC Aero. Inc. v. Muhs (In re Muhs)*, 923
F.3d 377, 384 (4th Cir.) (2019)).  Courts should narrowly construe exceptions to discharge against
the creditor and in favor of the debtor.  *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d

---

[10] Docket nos. 25, 41.

493, 497 (4th Cir. 2008) (*citing Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999)) ("When addressing exceptions to discharge, we traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start.").

### Section 523(a)(2)(A)

Section 523(a)(2)(A) makes a debt nondischargeable only "for money, property, services, or refinancing of credit, to the extent *obtained* by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).  The Supreme Court has determined that the phrase "to the extent obtained by" modifies "money, property, services or . . . credit[.]"  *Cohen v. De La Cruz*, 523 U.S. 213, 216 (1998).  The phrase clarifies that the money, property, or services obtained by fraud is the crux of the nondischargeability determination.  *Id* at 216–23.  Importantly, with regards to the "obtained by" language, "the purposes of the provision are to *prevent a debtor from retaining the benefits of property* obtained by fraudulent means," and so, "*[b]efore the exception applies, the debtor's fraud must result in a loss of property to the creditor*."  *In re Rountree*, 330 B.R. 166, 171, 173 (E.D. Va. 2004) (citing to Collier on Bankruptcy ¶ 523.08[1][a], [b], [d] (15th ed., rev.2004)) (noting that the purpose of § 523(a)(2)(A) was to deem nondischargeable "*the fraudulent acquisition of money or property by the debtor from the creditor*.") (emphasis in original)).  However, the Fourth Circuit has held that the language in § 523(a)(2)(A) "is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor."  *Pleasants v. Kendrick (In re Pleasants)*, 219 F.3d 372, 375 (4th Cir. 2000) (interpreting *Cohen*, 523 U.S. 213)).

To prevail under § 523(a)(2)(A), the Plaintiffs must show, by a preponderance of the evidence, that Mr. Mucklow: 1) made a false representation; 2) knew that the representation was false; 3) intended to deceive; 4) produced the victims' justifiable reliance on the

representation; and 5) proximately caused damage.  *SG Homes Assocs., LP v. Marinucci*, 718 F.3d

327, 334 (4th Cir. 2013); *Boyuka v. White* (*In re White*), 128 Fed. Appx. 994, 998 (4th Cir. 2005).

With regard to the "intent" prong of the test, "[s]ince the Court seldom has direct evidence of

fraudulent intent, we must usually resolve the question of intent by an examination of surrounding

circumstances."  *Espy v. Stevens (In re Stevens)*, 647 B.R. 299, 327 (Bankr. E.D. Va. 2022)

(internal citations and quotation marks omitted).  "Further, intent to deceive may be inferred if

defendant knowingly or recklessly made false representations, which he should know will induce

another to rely on them."  *Id.* (internal citations and quotation marks omitted).

### *Mr. Mucklow Made False Representations*

The Court has been able to discern at least several representations made by Mr.

Mucklow to the Plaintiffs that he knew to be false.  First, he told all three Plaintiffs that he had the

capital, through the initial $290,000 investment, to keep New Beginnings going for six months.

However, Mr. Mucklow stated in his testimony that those funds were used for initial operating

expenses, to "pay for everything from painting, mattresses, mattress covers, paper, toner, big-

screen television . . . machines . . . medication . . . . and also to clean . . . that facility out."  Tr.

180–81.  Mr. Mucklow knew that those funds had been depleted to pay for the New Beginnings'

facility costs and would not be available to pay employee wages.  Second, Mr. Mucklow

represented that he was qualified to be licensed by DHHR to operate New Beginnings and to be

reimbursed by Medicaid, all while knowing he had lied on his application by stating he did not

have a criminal record.  Third, Mr. Mucklow represented to the Plaintiffs that he was applying for

grants and had grant money coming in; however, he testified that, not only had he not actually

applied for any grants, but had any grants been approved, they would have gone to the New

Beginnings Foundation, not New Beginnings, which is the entity that employed and paid the Plaintiffs.

The Court believes that the Service for Stock Agreements that Mr. Mucklow claims Plaintiffs signed is yet another false representation, this time to the Court. Ms. Adkins, Ms. Halstead, and Ms. Elliot each testified credibly that they never signed any agreement to be compensated through shares of stock in lieu of their promised paychecks. Ms. Fragale also refused to sign such an agreement. The Plaintiffs also testified credibly to Mr. Mucklow's history of forging documents. Mr. Mucklow was given an extra opportunity to provide copies of these agreements with wet signatures after the Trial, but he failed to do so. For that reason, the Court did not admit these agreements as evidence and finds that Mr. Mucklow's testimony on this subject is not credible and false.

### Mr. Mucklow Knew that the Representations Were False

It is clear that Mr. Mucklow intended to deceive the Plaintiffs. He brought them into his office and showed them documents to convince the Plaintiffs that he had adequate investor funding and grant funding to pay wages. He convinced some of the Plaintiffs to leave good paying, fulltime employment to work for him. He promised them repeatedly that they would be paid, and he knew that they were ethically compelled to continue working for New Beginnings and treating patients regardless of whether they were actually paid. He kept the Plaintiffs between the proverbial rock and a hard place. When Plaintiffs began to see through those false representations, he threatened them by announcing that he would file for bankruptcy protection and would discharge any monies he owed to them if they quit working for New Beginnings. Furthermore, by examining his background, Mr. Mucklow can be described as nothing short of duplicitous. The Court need not rehash the specifics of his various deceptions; it is enough that he had to spend the

majority of his testimony trying to explain away his dishonest dealings.  Even his own attorney

had to clarify misstatements Mr. Mucklow made on the witness stand as being false.

### Plaintiffs Justifiably Relied on Mr. Mucklow's False Representations

Ms. Halstead, Ms. Elliot, and Ms. Adkins all testified that they relied on Mr.

Mucklow's representations, and this Court believes them.  Both Ms. Halstead and Ms. Adkins left

fulltime, well-paying, and stable jobs to come work for New Beginnings.  Ms. Halstead and Ms.

Fragale, who testified to hearing the same promises from Mr. Mucklow, believed in these

representations so much that they repeated them when recruiting employees for New Beginnings.

One of those new employees was Ms. Elliot, who asserted that she relied heavily on Mr.

Mucklow's representations that she would be paid.  He produced documents that supported the

financial stability of New Beginnings and persuaded them to believe that he had sufficient initial

investment capital to fund six months of operations.  He told the Plaintiffs about the subsequent

investor, despite that investor pulling his funds out.  The Plaintiffs' reliance on these false

representations was absolutely justified.

### Mr. Mucklow's False Representations Proximately Caused Damage

Finally, the false representations perpetrated by Mr. Mucklow directly caused the

Plaintiff's damages in lost wages.  He induced them to join New Beginnings and he fraudulently

obtained their services for New Beginnings, and then did not pay them for those services.  Once

Plaintiffs complained of nonpayment, he induced them to stay with further promises of funding

and/or threatened them to remain employed by New Beginnings or he would seek bankruptcy

protection and discharge his debts to pay their wages.  The Plaintiffs expended time and energy

working for New Beginnings, providing valuable services to patients and to the company that

should have been compensated.  They also forwent other opportunities of paid employment to

provide these services.  The Plaintiffs' damages unquestionably flow from their agreement to work for New Beginnings, which was procured by Mr. Mucklow's fraudulent representations.

The Court therefore finds that the debts owed to the Plaintiffs through the WVWPCA are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).  Because of this determination, the Court need not address whether 11 U.S.C. § 523(a)(6) applies.

### III.

After determining that Ms. Adkins was owed a debt pursuant to the WVWPCA, the Court then analyzed the applicability of § 523(a)(2)(A) to the obligations owed by Mr. Mucklow to all three Plaintiffs.  All the elements of § 523(a)(2)(A) were satisfied by the testimony and evidence provided at the Trial, and therefore, the claims held by Ms. Halstead, Ms. Elliot, and Ms. Adkins, are hereby deemed nondischargeable.  Accordingly,

**IT IS ORDERED** that Ms. Adkins holds a judgment against Mr. Mucklow for $24,963.50.

**IT IS FURTHER ORDERED** that the judgments held by Ms. Adkins, Ms. Halstead, and Ms. Elliot against Mr. Mucklow are hereby deemed **NONDISCHARGEABLE.**